## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Sharon Dekontee Wright,
individually, and Burak C.
Bingollu, on behalf of himself and all
others similarly situated,

               Plaintiffs,

v.

One Source Technology, LLC d/b/a
Asurint,

               Defendant.

Case No. 0:22-cv-00077-NEB-DTS

**FIRST AMENDED COMPLAINT**

**JURY DEMANDED**

_____

Burak C. Bingollu ("Plaintiff Bingollu"), by and through his attorneys, on behalf of himself and the Class set forth below, brings this Complaint against One Source Technology, LLC d/b/a/ Asurint ("Defendant" or "Asurint"). In addition, Sharon Dekontee Wright ("Plaintiff Wright"), by and through her attorneys, on behalf of herself, brings individual claims against Defendant.

### <u>PRELIMINARY STATEMENT</u>

1. Defendant, a consumer reporting agency, falsely reported to Plaintiff Wright's healthcare employer that (1) Plaintiff Wright's identity, including her Social Security Number ("SSN") could not be verified; (2) Plaintiff Wright was the subject of healthcare-related sanctions; and (3) Plaintiff Wright was a participant in a multi-million dollar fraud.

2. In reality, Plaintiff Wright's SSN was valid and could easily be verified.

Moreover, the sanctions that Defendant attributed to Plaintiff Wright belonged to someone else named Sharon Wright, who had a completely different middle name than Plaintiff Wright and who resided in a state where Plaintiff Wright, a recent immigrant to the United States, had never lived. Finally, the individual involved in the multi-million dollar fraud did not even share Plaintiff Wright's name, but had once used the name "Sharon Wright" as an *alias* while advancing the fraud.

3.      As a result of Defendant's false report, Plaintiff Wright was taken off her job, was forced to spend time and energy to fix her report, and experienced harm to her reputation.

4.      Defendant reported to Plaintiff Bingollu's potential employer that Plaintiff Bingollu's identity, including his SSN, could not be verified.

5.      In reality, Plaintiff Bingollu's SSN—which was issued several years before Defendant issued its report—was valid and could easily be verified.

6.      As a result of Defendant's false report, Plaintiff Bingollu experienced harm to his reputation, emotional distress, and the hiring process was hindered.

7.      Plaintiff Wright comes to this Court seeking redress for herself for Defendant's inaccurate SSN and sanctions reporting. Meanwhile, Plaintiff Bingollu comes to this Court seeking redress for himself and others who had inaccurate reports issued by Defendant related to Defendant's SSN reporting procedures.

8.      Employers, lenders, and landlords use consumer reports to deny people jobs, credit, and housing. Congress has chosen to regulate the content and procurement of these reports through the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq*.

9.      Defendant, a large consumer reporting agency, has systematically and willfully violated the FCRA by failing to use "reasonable procedures" to assure the "maximum possible accuracy" of its reports. 15 U.S.C. § 1681e(b).

10.     Defendant is a background check company that produces reports for employers. These reports can include criminal history information, sanctions information, and identity verification services.

11.     As set forth in further detail below, in producing these reports, Defendant has violated the FCRA in two ways.

12.     First, Defendant sells numerous products that purport to "help validate candidate information"[1] and, in particular, to verify whether a consumer's SSN can be validated at all.

13.     However, despite touting its capabilities in SSN validation, Defendant adopted a common policy to report that any SSN issued after June 24, 2011 was incapable of being validated or verified.

14.     Defendant's reporting was incorrect: Consumers' SSNs that were issued after June 24, 2011 *can* be verified. Indeed, Defendant knew from information provided by its third-party vendor that many such SSNs were valid, yet Defendant nonetheless proceeded to report that those SSNs could not be validated.

15.     Defendant's practice of reporting that certain consumers' SSNs could not be verified or validated, based merely on the fact that they were issued after a certain date,

---

[1] https://www.asurint.com/solutions/social-security (last visited August 24, 2023).

was unreasonable, and resulted in Defendant inaccurately reporting that the SSNs of certain consumers, namely those with relatively new SSNs, were *incapable* of verification. Defendant thus systematically violated 15 U.S.C. § 1681e(b).

16.   <u>Second</u>, in the case of Plaintiff Wright, Defendant used "name-only" matching procedures to match Plaintiff Wright to healthcare professionals who have been subject to exclusions, sanctions, debarments, and other disciplinary actions. Defendant carelessly matched Plaintiff Wright to such Fraud Abuse Control Information System ("FACIS") records based exclusively on Plaintiff Wright's first and last name, even though Defendant had additional information—such as Plaintiff Wright's middle name, SSN, date of birth, and address history—that, if used, would have enabled Defendant to easily rule out false "matches" for Plaintiff Wright.

17.   By failing to utilize all of the identifying information at its disposal in reporting FACIS results on Plaintiff Wright, Defendant violated 15 U.S.C. § 1681e(b).

18.   Based on Defendant's systemic practices with respect to its SSN reporting, Plaintiff Bingollu asserts FCRA claims on behalf of himself and the Class set forth below, and seeks all available damages, including actual and/or statutory damages, punitive damages, attorneys' fees, litigation expenses, costs, and all available other appropriate relief.

19.   Meanwhile, based on Defendant's inaccurate SSN and FACIS reporting, Plaintiff Wright asserts FCRA claims on behalf of herself individually, and seeks all available damages, including actual and/or statutory damages, punitive damages, attorneys' fees, litigation expenses, costs, and all available other appropriate relief.

4

## THE PARTIES

20.     Individual Plaintiff Sharon Dekontee Wright is a resident of Hennepin County, Minnesota.

21.     Individual and representative Plaintiff Burak C. Bingollu is a resident of Fillmore County, Minnesota.

22.     Defendant is a consumer reporting agency headquartered in Cleveland, Ohio that specializes in providing consumer reports for employment purposes.[2]

## JURISDICTION AND VENUE

23.     This Court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

24.     Venue is proper as this case was removed from Minnesota state court, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATUTORY BACKGROUND

25.     In 1970, Congress passed the FCRA to address two related concerns. First, consumer reports were playing an increasingly central role in people's lives at crucial moments, such as when they applied for a job, credit, or housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies, thereby impairing individuals' access to employment, housing, and other critical opportunities.

26.     Recognizing that unregulated consumer reporting agencies and the inaccurate reports they were producing were harming the economy, as well as individual

---

[2] *See generally* https://www.asurint.com/solutions (last visited Dec. 17, 2021).

consumers, Congress set out to overhaul the credit reporting industry. *See, e.g., Beseke v. Equifax Info. Servs. LLC*, 420 F. Supp. 3d 885, 890 (D. Minn. 2019) ("The FCRA was crafted to protect consumers from the transmission of inaccurate information about them.") (internal citation omitted); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("The FCRA was the product of congressional concern over abuses in the credit reporting industry."); *Pinner v. Schmidt*, 805 F.2d 1258, 1261 (5th Cir. 1986) ("The legislative history of the FCRA indicates that its purpose is to protect an individual from inaccurate or arbitrary information about himself in a consumer report that is being used as a factor in determining the individual's eligibility for credit, insurance, or employment.").

27.     In crafting the FCRA, Congress was particularly concerned about the use of background reports in the employment context, and therefore expressly defined the term "consumer reports" to include background reports procured for employment purposes. *See* 15 U.S.C. § 1681a(d)(1)(B).

28.     Whether used for employment or other purposes, inaccuracies in consumer reports can be devastating, causing individuals to needlessly lose out on important opportunities. Thus, ensuring the accuracy of consumer reports is a foundational goal of the FCRA. *See* 15 U.S.C. § 1681. In line with this goal, the FCRA sets a high bar for consumer reporting agencies, which—given their "vital role" in preparing consumer reports—have "grave responsibilities" to consumers. *Id*.

29.     Specifically, under 15 U.S.C. § 1681e(b), "[w]henever a consumer reporting agency prepares a consumer report," it is required "to follow reasonable procedures to

assure **maximum possible accuracy** of the information concerning the individual about whom the report relates" (emphasis added).

30.     As described below, Defendant wholly disregarded its duties under 15 U.S.C. § 1681e(b) with respect to Plaintiff Wright, Plaintiff Bingollu, and members of the proposed Class.

## ALLEGATIONS RELATING TO PLAINTIFF BINGOLLU

### A.     Background

31.     Originally from Turkey, Plaintiff Bingollu first moved to the United States in or around 2006, and first received a working permit, and SSN, in or around 2012.

32.     In the summer of 2020, Plaintiff Bingollu applied for a job through Staffmark Group ("Staffmark").

33.     Plaintiff Bingollu was extended an offer, conditioned on him passing a background check. On or around July 2, 2020, Staffmark ordered a consumer report on Plaintiff Bingollu from Defendant, providing Defendant with background details on Plaintiff Bingollu, including his full name, date of birth, SSN, and address history.

### B.     The Inaccurate Report and Unreasonable Procedures

34.     The consumer report that Defendant prepared on Plaintiff Bingollu, for a fee, and provided to Staffmark (Ex. 1) contained inaccuracies, which were the result of Defendant's failure to follow reasonable procedures to assure the maximum possible accuracy of the information contained in its consumer reports, in violation of the FCRA.

35.     Specifically, Defendant stated in Plaintiff Bingollu's report that it did not or could not verify Plaintiff Bingollu's basic identifying information, including his date of

birth. Under a section titled "SSN Trace Level 2," Defendant also stated that it was "**unable to validate**" Plaintiff Bingollu's SSN and, in fact, that Plaintiff Bingollu's SSN "**cannot** be verified." (Exhibit 1 at p. 1 (emphasis added).)

36.    This was inaccurate. Plaintiff Bingollu's SSN *could* be validated and verified.

37.    Prior to 2011, SSNs were generated using a pattern whereby the initial digits reflected the date and location of issue. Therefore, it was possible to "verify" an individual's SSN based on the number itself. Since June 24, 2011, however, SSNs have been randomly generated.

38.    Defendant reported that Plaintiff Bingollu's SSN could not be verified only because Defendant had adopted a common policy to report that any SSN issued after June 24, 2011 was incapable of being validated.

39.    This practice yielded predictably inaccurate and misleading results.

40.    Defendant's reporting that Plaintiff Bingollu's SSN could not be verified or validated was false. Plaintiff Bingollu's SSN was first issued in or around 2012; he received his permanent, and current, SSN card on January 14, 2013. In July 2020, Plaintiff Bingollu's SSN was therefore capable of being validated or verified. As described in further detail below, the SSN could be verified by using consent based social security verification ("CSBV"), using third-party vendors, or requesting and reviewing additional documentation from Plaintiff Bingollu.

41.    Instead of taking any additional steps, Defendant simply reported that Plaintiff Bingollu's SSN could not be verified, because it was issued after June 24, 2011.

Defendant's practice was unreasonable and caused Defendant to issue an inaccurate report on Plaintiff Bingollu. This reporting caused Plaintiff Bingollu distress, damaged his reputation, and caused a delay in the hiring process.

## ALLEGATIONS RELATING TO PLAINTIFF WRIGHT

### A.    Background

42.    Originally from Liberia, Plaintiff Wright had long dreamed of moving to America. With her son, sister, and American husband all living in the United States, Plaintiff Wright began the grueling process of applying for a green card in 2018. After three long years of submitting paperwork, Plaintiff Wright's green card was finally issued on January 23, 2021; Plaintiff Wright moved to the United States that month. On March 23, 2021, her Social Security card was issued.

43.    Eager to support herself and her family, and to contribute to her newfound community, Plaintiff Wright immediately began searching for employment.

44.    At the suggestion of her sister—who had immigrated to Minnesota years prior and previously worked at Medtronic—Plaintiff Wright applied through a staffing agency, Staffmark, to work at Medtronic in a medical assembly position.

45.    Plaintiff Wright completed a skills test and interview with Staffmark in late March 2021.

46.    On April 2, 2021, Plaintiff Wright authorized Staffmark to obtain a consumer report on her for employment purposes.

47.    On April 2, 2021, Staffmark ordered a consumer report on Plaintiff Wright

from Defendant, providing Defendant with background details on Plaintiff Wright, including her full name, date of birth, SSN, and address history.

48.    On Monday, April 12, 2021, Plaintiff Wright began working at Medtronic. She also worked on Tuesday, April 13, 2021.

49.    On Wednesday, April 14, 2021, Plaintiff Wright was driving to her job at Medtronic when she received a message from an employee at Staffmark, asking Plaintiff Wright to call them.

50.    Plaintiff Wright called the Staffmark employee, who then informed Plaintiff Wright that her consumer report, which had been completed by Defendant, had come back "red." Staffmark instructed Plaintiff Wright not to come into work that day.

51.    Plaintiff Wright was devastated. Given her clean record, she could not understand why her consumer report had come back "red." She worried that, despite all of her efforts to make it to America and her dreams of building a better life here, whatever was in the consumer report that Defendant had prepared might prevent her from ever working again in the United States.

### B.    The Inaccurate Report and Unreasonable Procedures

52.    As it turns out, the consumer report that Defendant prepared on Plaintiff Wright, for a fee, and provided to Staffmark (Ex. 2 at 14-24) was inaccurate. These inaccuracies were the result of Defendant's failure to follow reasonable procedures to assure the maximum possible accuracy of the information contained in its consumer reports, in violation of the FCRA.

### 1.    SSN Results

53.     Defendant stated in the report on Plaintiff Wright that it did not or could not verify Plaintiff Wright's basic identifying information. First, under a section titled "SSN Trace Level 2," Defendant reported that both Plaintiff Wright's name and date of birth were "not verified." (Ex. 2 at 15.) Second, and most critically, Defendant stated that it was "**unable** to validate" Plaintiff Wright's SSN and, in fact, that Plaintiff Wright's SSN "**cannot** be verified." (*Id.* (emphasis added).)

54.     This was inaccurate. Plaintiff Wright's SSN *could* be validated and verified.

55.     Plaintiff Wright's SSN was issued on March 23, 2021, nearly two weeks before Staffmark ordered the report. Plaintiff Wright's SSN was capable of being validated or verified by, for example, consent-based Social Security verification ("CBSV"), third-party vendors, or requesting and reviewing additional documentation from Plaintiff Wright.

56.     Instead of using CBSV or taking any additional steps, Defendant simply reported that Plaintiff Wright's SSN could not be verified, because it was issued after June 24, 2011. Defendant's practice was unreasonable and caused Defendant to issue an inaccurate report on Plaintiff Wright.

### 2.     FACIS Results

57.     In addition to falsely claiming that Plaintiff Wright's SSN could not be verified, Defendant also included additional inaccurate and derogatory information in Plaintiff Wright's report.

58.     In particular, Defendant inaccurately (1) portrayed Plaintiff Wright as a disgraced healthcare professional from Arizona (Ex. 2 at 15-19) and (2) implicated that

Plaintiff Wright was involved in a multi-million dollar, Georgia-based debt collection scam between 2009 and 2014. (Ex. 2 at 19-21.) Both of these entries on the report were false.

59.    Defendant inaccurately included these records in the section of Plaintiff Wright's report titled "FACIS – Level 3."

60.    Defendant sells and includes in its reports results for FACIS by using data from a third-party company, Verisys, which owns the FACIS database.[3]

61.    According to Verisys, "FACIS is the most comprehensive database for screening and monitoring healthcare providers, staff, and entities ensuring compliance and protecting you from legal, financial, and reputational risk. Our database taps federal and state sources for exclusions, debarments, sanctions, and disciplinary actions against healthcare professionals and businesses for *all published license types and publishing jurisdictions*."[4]

62.    Verisys boasts that, "[w]hen used for screening and monitoring, [FACIS] protects your organization and patients from providers, workforce, vendors, volunteers, board members, research teams, and transportation suppliers who are excluded, debarred, sanctioned or disciplined."[5]

63.    "FACIS draws from thousands of sources," including, for example, State Medicaid Exclusions, State Board Disciplinary Actions, the Federal Bureau of Investigation, and the Department of Justice.[6] All, told, the FACIS database includes 10

---

[3] https://verisys.com/product/facis/ (last visited Dec. 17, 2021).
[4] *Id.* (emphasis in original).
[5] *Id.*
[6] *Id.*

million records from more than 5,000 primary sources.[7]

      **i.**   **Defendant Inaccurately Matched Plaintiff Wright to a Disgraced Arizona Healthcare Professional Based Only on First and Last Name**

64.     In the FACIS results of its report, Defendant included two related entries for a "Sharon M Wright." ("Arizona Disciplinary Records.") As the report on Plaintiff Wright explains in great detail, *this* Sharon Wright, an Arizona counselor with a License Number of LAC-15677, was subject to a consent agreement under which she was disciplined for engaging in "unprofessional conduct" and a "therapeutically inappropriate" relationship with a client. Ultimately, she was found to have violated A.R.S. § 32-3251 (16)(l) by engaging in any conduct, practice or condition that impairs the ability of the licensee to safely and completely practice the licensee's profession, and, in addition to other disciplinary action, was placed on probation for 24 months, beginning in 2019.

65.     Plaintiff Wright's middle name, Dekontee, does not begin with the letter "M."

66.     Defendant was aware of Plaintiff Wright's middle name when it prepared its Report, given that it lists Plaintiff Wright's full name as "Sharon Dekontee Wright." (Ex. 2 at 14.)

67.     Additionally, Plaintiff Wright has never lived (and certainly has never been a licensed counselor) in Arizona. Plaintiff did not even live in the United States until 2021.

68.     Defendant was aware that Plaintiff Wright never resided in Arizona, as the

---

[7] *Id.*

report lists no addresses in Arizona for Plaintiff Wright under the "Address History" section. (Ex. 2 at 15.)

69.     Yet, despite having additional identifying information available on Plaintiff Wright that, if utilized, would have made clear that Plaintiff Wright was *not* Sharon M Wright, Defendant erroneously included the Arizona Disciplinary Records in the FACIS results in Plaintiff Wright's report, based only on the fact that Plaintiff Wright and Sharon M. Wright shared first and last names.

70.     Defendant knew it should use more information, such as a date of birth or SSN to verify the match, but failed to do so. In a section of the record for the Arizona Disciplinary Records entitled "Match Criteria," the report states: "Unable to determine. Additional information required: Correct SSN Correct DOB Public records query using Candidate's SSN." (Ex. 2 at 17, 19.)

> ii. **Defendant Inaccurately Matched Plaintiff Wright to an Accused Criminal Who Had *Once* Used Her First and Last Name as an *Alias***

71.     In addition to using loose, name-only matching criteria to falsely attribute damning disciplinary records to Plaintiff Wright, Defendant also included in its FACIS results for Plaintiff Wright the text of a 2014 press release from the Department of Justice and United States Attorney's Office for the Southern District of New York titled "Manhattan U.S. Attorney And FBI Assistant Director Announce Charges And Arrests In Multimillion-Dollar Debt Collection Scam That Targeted More Than 6,000 Victims In All

50 States."[8] (Ex. 2 at 19-21.) ("DOJ Press Release.")

72.    The DOJ Press Release—which is included in the FACIS results section of the report, word for word, without any further context or commentary—detailed an elaborate multi-million dollar scam run by Williams, Scott & Associates ("WSA"), a debt collection company based in Norcross, Georgia. As alleged in the press release, and included in Plaintiff Wright's FACIS results, between 2009 and 2014, the owner and several employees of WSA tricked thousands of consumers through a web of lies, including that WSA was part of a federal task force and that warrants would be issued for the consumers' arrests if they failed to make immediate payments to WSA.

73.    Apparently, in advancing the scam, one WSA employee, Benita Cannedy, allegedly identified herself to a victim as a law enforcement agent with the name of "Sharon Wright."

74.    Using first and last name as the only matching criteria, Defendant erroneously attributed the DOJ Press Release about the WSA scam to Plaintiff Wright, simply because someone had used her first and last name once as an *alias*.

75.    Defendant was aware that its procedures failed to return accurate results and that it should have used additional information to verify the "match" to the DOJ Press Release. In the section of the report regarding this DOJ Press Release record, titled "Match Criteria," the report states: "Unable to determine. Additional information required: Correct SSN Correct DOB Public records query using Candidate's SSN." (Ex. 2 at 21.) Defendant

---

[8]    *See*    https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-and-fbi-assistant-director-announce-charges-and-arrests (last visited Dec. 17, 2021).

nonetheless included the DOJ Press Release in Plaintiff Wright's FACIS results.

76.    As with the Arizona Disciplinary Records, Defendant had in its possession information that, if used, would have made clear that Plaintiff Wright was in no way involved in the WSA scam. But even without such additional identifying information, the DOJ Press Release itself makes clear that *no one* named Sharon Wright was *actually* involved.

77.    Had Defendant used any matching criteria beyond Plaintiff Wright's first and last name, or performed any sort of review of its FACIS results in the report, it would have quickly discovered that the DOJ Press Release—like the Arizona Disciplinary Records— had nothing to do with Plaintiff Wright.

78.    Due to Defendant's failure to use identifying information within its possession to verify supposed matches to damning FACIS results, and failure to perform any sort of quality assurance, Plaintiff Wright's employer received an inaccurate consumer report that (1) inaccurately stated that Plaintiff Wright's SSN could not be verified; (2) falsely stated Plaintiff Wright had been the subject of very serious professional discipline; and (3) suggested that Plaintiff Wright had participated in a criminal, multi-million dollar scam.

**C.    The Aftermath**

79.    On April 15, 2021, Plaintiff Wright submitted a dispute to Defendant regarding both the SSN and FACIS results on the report. That same day, Defendant opened a case internally for Plaintiff Wright's dispute.

80.    On April 15, 2021, a Client Support Representative employed by Defendant

emailed Defendant's Compliance team, stating that "[Plaintiff Wright] would like to initiate a dispute for their Background check report as they have advise[d] **no records should be report[ed] For FACIS level 3**…" (Ex. 2 at 36 (emphasis added).)

81.     Also on April 15, 2021, an employee at Defendant indicated in the comments on Plaintiff Wright's case that they had called Plaintiff Wright, and she "wants to dispute SSN, DOB, and Name." (Ex. 2 at 39.) The employee reported that they advised Plaintiff Wright to email her passport and green card to Defendant. (Ex. 2 at 39.) On April 16, 2021, Plaintiff Wright submitted pictures of both requested documents to Defendant, asking Defendant to "[p]lease address this issue as quickly as possible" because she "need[ed] to start [her] work." (Ex. 2 at 44.)

82.     Despite the fact that Plaintiff Wright had disputed *both* her inaccurate SSN and FACIS results, Defendant initially investigated only the former.

83.     On April 20, 2021, Defendant "[r]eviewed the documents" that Plaintiff Wright had provided and closed out Plaintiff Wright's dispute as "complete" and "overturned" because her name, date of birth, and SSN were all verified. (Ex. 2 at 39.)

84.     On April 21, 2021, however, Staffmark noted to Defendant that the FACIS results that Plaintiff Wright had disputed still had not been resolved. (Ex. 2 at 38-39.)

85.     On April 21, 2021, Defendant reported to Staffmark that it had "re-opened" the investigation and was "conducting research into the FACIS information on the report." (Ex. 2 at 38.)

86.     That same day, Defendant conducted further investigation, doing the type of basic quality assurance it should have done *before* including the FACIS results on Plaintiff

Wright's report in the first place.

87.    At 11:28 a.m., Defendant searched the Office of Inspector General and System for Award Management. (Ex. 2 at 38.)

88.    At 11:30 a.m., for the Arizona Disciplinary Records, Defendant "[s]earched the Arizona Board of Behavioral Health Examiners," and noted that "[Plaintiff Wright] has never lived in AZ." (Ex. 2 at 38.)

89.    Also at 11:30 a.m., for the DOJ Press Release, Defendant reviewed the press release and found that "[n]o match criteria [were] available." (Ex. 2 at 38.)

90.    At 11:40 a.m., after performing these rudimentary steps, a process which took only 12 minutes, Defendant removed all FACIS results—both the Arizona Disciplinary Records and the DOJ Press Release—from Plaintiff Wright's report and closed out her dispute as overturned. (Ex. 2 at 38.)

91.    But, by then, the damage had been done. Defendant's inaccurate report caused Plaintiff Wright to be taken off her job (and, as a result, to spend time and energy applying for alternative employment), forced her to spend time and energy to fix her Report, harmed her reputation, and caused her emotional distress.

## DEFENDANT'S ILLEGAL BUSINESS PRACTICES

92.    Defendant's processes and procedures are largely automated and systematic. By systematically failing to follow reasonable procedures to assure the maximum possible accuracy of the information included in its consumer reports, Defendant has willfully violated 15 U.S.C. § 1681e(b).

93.    Defendant sells background checks to employers that run background checks

on job applicants and employees.

94.    The background checks are consumer reports as defined by the FCRA, 15 U.S.C. 1681a(d).

95.    Defendant is a consumer reporting agency as defined by the FCRA, 15 U.S.C. § 1681a(f).

96.    Defendant's "criminal background screening services cover the traditional requests," as well as services that Defendant has "championed by leveraging [] technology and data."[9]

97.    For example, Defendant offers to include Department of Corrections, Criminal Information Bureau, Sex Offender Registry, and, as discussed above, FACIS database searches to complete criminal background checks.[10]

98.    Defendant fails to follow reasonable procedures to assure the maximum possible accuracy of the information included in its consumer reports.

**A.    Inaccurate SSN Reporting**

99.    First, as described above, Defendant adopted a common policy that, for any SSN issued after June 24, 2011, Defendant would simply report that the SSN was incapable of being validated or verified.

100.    As in the case of both Plaintiff Wright and Plaintiff Bingollu (collectively, "Plaintiffs"), such reporting is inaccurate: each Plaintiff's SSN *could* be verified.

---

[9] *See* https://www.asurint.com/solutions/criminal-background-searches (last visited Dec. 17, 2021).
[10] *Id.*

101.    Across the credit reporting industry, CBSV is widely recognized as the gold standard for verifying an individual's SSN, name, and date of birth.[11]

102.    As the Social Security Administration ("SSA"), which administers CBSV, explains: "With the consent of the SSN holder, CBSV can verify if the SSN holder's name, date of birth, and SSN match SSA's records."[12]

103.    Because CBSV matches an individual's information directly to SSA records, it "is **virtually 100% accurate** matching Name, SSN, DOB, Gender and Death Indicator to SSA Master File/Death Index."[13]

104.    Indeed, Defendant acknowledges that CBSV is one of the few methods available to validate a consumer's identity, and the only way to do so pre-hire:

> Employers are generally familiar with the I-9 verification and its restrictions. This check can only be conducted post-hire to validate a candidate's SSN.
>
> Today, it's incredibly important to ensure that employees are legally authorized to work in the U.S. Confirming that candidate has a valid SSN can add a layer of certainty to the recruitment process. For this, organizations should consider the only SSN verification check possible *pre-hire*, consent-based social security verification (CBSV).[14]

---

[11] *See, e.g.*, https://www.acciodata.com/products-services/cbsv/ (last visited Dec. 17, 2021) ("Social Security number and name mismatching is far more problematic (and expensive) post-hire. That's why many leading [consumer reporting agencies] offer consent-based social security number verification (CBSV) as a pre-hire **best practice** option for their clients.") (emphasis added); https://www.idvalidation.com/UploadedPDFs/Use%20CBSV%20before%20background%20checks.pdf (last visited Dec. 17, 2021) ("Prior to every background check, Consent Based SSN Verification (CBSV) from Social Security Administration (SSA) - is **a recommended Industry Standard Best Practice**.") (emphasis added).

[12] https://www.ssa.gov/cbsv/ (last visited Dec. 17, 2021).

[13]                              https://www.idvalidation.com/UploadedPDFs/BestPractices-RunCBSVBeforeaBackgroundCheck.pdf (last visited Dec. 17, 2021) (emphasis added).

[14]    https://www.asurint.com/resource-center/blog/march-2019/the-importance-of-answering-the-basic-question%E2%80%94who    (last    visited    Dec.    17,    2021)

105.    While Defendant offers CBSV as one of its "Social Security Number-based solutions and service offerings" that can "help validate candidate information," Defendant *also* provides other alternatives, including its own product.[15] Third-party vendors are also available to verify SSNs, and Defendant has utilized such vendors.

106.    To account for the change in the generation of SSNs described above, in instances where its customers did not order CBSV, Defendant simply adopted a common policy to report that any SSN issued after June 24, 2011 was incapable of being validated.

107.    Through this unreasonable policy, Defendant willfully and systematically violated the FCRA.

108.    Defendant's willfulness is evidenced in part by the fact that Defendant offers its customers CBSV and knows what that method entails—specifically, that it relies on the most updated data in the SSA Master File.[16] Therefore, Defendant knew that SSNs issued after June 24, 2011 could be validated.

109.    Defendant also knew that many consumers' SSNs issued after June 24, 2011 were, in fact, valid.

110.    Defendant receives "SSN Trace" information from its third-party vendor, LexisNexis. Through this data, LexisNexis checks whether the SSN provided by the consumer matches a valid SSN in LexisNexis's records.

---

(emphasis in original).

[15] *See* https://www.asurint.com/solutions/social-security (last visited August 24, 2023).

[16]        https://www.asurint.com/resource-center/blog/march-2019/the-importance-of-answering-the-basic-question%E2%80%94who (last visited Dec. 17, 2021).

111.    For thousands of consumers, Defendant reported that their SSNs could not be verified, despite the fact that LexisNexis reported to Defendant that those consumers' SSNs were an exact match to SSNs in LexisNexis's records.

112.    In other words, for numerous consumers, Defendant reported that the consumer's SSN could not be verified merely because the SSN was issued after June 24, 2011, and even though LexisNexis confirmed that the SSN was in its records, thus indicating that the SSN was valid.

113.    Finally, Defendant knew that its policy was yielding inaccurate SSN results from consumers that disputed Defendant's inaccurate SSN reporting.

**B.    Inaccurate FACIS Reporting**

114.    Second, in the case of Plaintiff Wright, Defendant's use of name-only matching caused Defendant to include information in the FACIS results of her report that did not belong Plaintiff Wright. This procedure creates what are known as "mixed files," namely a consumer report in which some or all of the information in the report pertains to a person other than the person who is the subject of the report.

115.    The cause of this problem was Defendant's failure to use Plaintiff Wright's full identifying information, such as her middle name, date of birth, or address, in reporting FACIS records.

116.    Instead of using all identifying information at its disposal about Plaintiff Wright, Defendant instead matched Plaintiff Wright to FACIS records based only on first and last name.

117.    In so doing, Defendant placed its business interests above the rights of

Plaintiff Wright, because it was cheaper and easier for Defendant to produce a report containing information that is inaccurate than it was for Defendant to exert proper quality control before providing its report on Plaintiff Wright to Staffmark.

118.   Indeed, Defendant regularly markets that it completes background checks faster than industry averages.[17] Defendant reported erroneous information on Plaintiff Wright because it wanted to maximize the automation of its report creation process, thereby saving the cost and time that would be necessary to conduct additional review and quality control and remove inaccurate entries.

119.   In addition, Defendant used loose matching criteria so that it could report *some* information to Staffmark (whether accurate or not), in order to maximize profits. Indeed, Defendant markets that it provides "10% higher record matches than traditional methods,"[18] while failing to mention that many of these "matches" are the result of mixed files. Defendant thus intentionally compromises the accuracy of its reports in an effort to increase sales.

120.   Defendant is aware of the FCRA's requirements as it has been sued repeatedly for its inaccurate background reporting and inadequate procedures, including

---

[17] *See, e.g.*, https://www.asurint.com/why-asurint/our-process (last visited Dec. 17, 2021) ("Asurint searches are completed 24-36 hours faster"); https://www.asurint.com/about-us (last visited Dec. 17, 2021) ("Today our team [] ha[s] provided our clients with results 24-36 hours faster than the competition—and the team's not stopping there."); https://www.asurint.com/industries-we-serve/healthcare (last visited Dec. 17, 2021) ("Our team will be with you every step of the way to ask questions and fine-tune your healthcare background check process to help make it more efficient and cost-effective while preserving accuracy and turnaround times.").

[18] https://www.asurint.com/industries-we-serve/healthcare (last visited Dec. 17, 2021).

alleged violations of 15 U.S.C. § 1681e(b).

## CLASS ACTION ALLEGATIONS

121.    Plaintiff Bingollu asserts his § 1681e(b) claims against Defendant on behalf of the following Class:

> All individuals who were the subjects of consumer reports furnished by Defendant since December 27, 2019 and continuing through the date that the class list is prepared for which Defendant reported that the SSN could not be validated because the SSN was issued after June 24, 2011.

122.    This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23.

123.    <u>Numerosity</u>: The Class is so numerous that joinder of all class members is impracticable. Defendant regularly furnishes consumer reports and impermissibly includes inaccurate information. Given the volume of Defendant's business, thousands of consumers satisfy the definition of the Class.

124.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members, including but not limited to:

> a)  Whether Defendant violated the FCRA by failing to follow reasonable procedures to assure the maximum possible accuracy of the information contained in its consumer reports;
>
> b)  Whether Defendant's violations were willful;
>
> c)  The proper measure of statutory damages; and
>
> d)  The proper measure of punitive damages.

125.   <u>Typicality</u>: Plaintiff Bingollu's claims are typical of the members of the Class. Defendant typically does not follow reasonable procedures to ensure the information it is reporting is accurate. The FCRA violations suffered by Plaintiff Bingollu are typical of those suffered by other class members, and Defendant treated Plaintiff Bingollu consistent with other class members, in accordance with its standard policies and practices.

126.   <u>Adequacy</u>: Plaintiff Bingollu is a member of the Class, will fairly and adequately protect the interests of the Class, and has retained counsel experienced in complex class action litigation generally, and in FCRA litigation in particular.

127.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this First Amended Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

**<u>COUNT I</u>**
**Failure to Maintain Reasonable Procedures to Assure Maximum Possible Accuracy**
**15 U.S.C. § 1681e(b)**
***Asserted on Behalf of Plaintiff Bingollu and the Class***

128.    Defendant violated the FCRA by failing to follow reasonable procedures to assure maximum possible accuracy of the SSN verification information included in its consumer reports. *See* 15 U.S.C. § 1681e(b).

129.    Defendant acted negligently and/or willfully and in knowing or reckless disregard of its obligations and rights of Plaintiff Bingollu and the class members.

130.    In addition to the conduct set forth above, Defendant's willful conduct is reflected by, *inter alia*:

a)  Defendant received dozens of disputes, challenging its SSN verification reporting;

b)  The FCRA was enacted in 1970; Defendant has had since its founding, nearly 20 years ago, to become compliant;

c)  Defendant is a large corporation which specializes in furnishing consumer reports for employment purposes and has access to legal advice through its own general counsel's office and outside employment counsel, yet there is no contemporaneous evidence that Defendant determined that its conduct was lawful;

d)  Defendant's conduct is inconsistent with longstanding regulatory guidance, judicial interpretation, and the plain language of the statute;

e)  Defendant's similarly situated competitors have adopted policies of using all identifying information available to ensure the record being reported is accurate;

f)  Despite the pellucid statutory text and there being a depth of guidance, Defendant adopted a policy of systematically failing to maintain procedures that ensured the information being reported was accurate; and

g)  By adopting such a policy, Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

131.    Plaintiff Bingollu and the Class are entitled to actual damages and/or

statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. §§ 1681o, n(a)(1)(A).

132.    Plaintiff Bingollu and the Class are also entitled to punitive damages, pursuant to 15 U.S.C. § 1681n(a)(2).

133.    Plaintiff Bingollu and the Class are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

<u>COUNT II</u>
**Failure to Maintain Reasonable Procedures to Assure Maximum Possible Accuracy**
**15 U.S.C. § 1681e(b)**
*Asserted on Behalf of Plaintiff Wright Individually*

134.    Defendant violated the FCRA by failing to follow reasonable procedures to assure maximum possible accuracy of the (1) SSN verification and (2) FACIS information included in its consumer report on Plaintiff Wright. *See* 15 U.S.C. § 1681e(b).

135.    Defendant acted negligently and/or willfully and in knowing or reckless disregard of its obligations and rights of Plaintiff Wright.

136.    In addition to the conduct set forth above, Defendant's willful conduct is reflected by, *inter alia*:

    a)  Defendant received dozens of disputes, challenging its SSN verification reporting;

    b)  The FCRA was enacted in 1970; Defendant has had since its founding, nearly 20 years ago, to become compliant;

    c)  Defendant is a large corporation which specializes in furnishing consumer reports for employment purposes and has access to legal advice through its own general counsel's office and outside employment counsel, yet there is no contemporaneous evidence that Defendant determined that its conduct was lawful;

d) Defendant's conduct is inconsistent with longstanding regulatory guidance, judicial interpretation, and the plain language of the statute;

e) Defendant's similarly situated competitors have adopted policies of using all identifying information available to ensure the record being reported is accurate;

f) Despite the pellucid statutory text and there being a depth of guidance, Defendant adopted a policy of systematically failing to maintain procedures that ensured the information being reported was accurate; and

g) By adopting such a policy, Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

137. Plaintiff Wright is entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorneys' fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## **PRAYER FOR RELIEF**

138. WHEREFORE, Plaintiff Bingollu, on behalf of himself and the Class, prays for relief as follows:

a) determining that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b) designating Plaintiff Bingollu as representative for the Class and designating Plaintiff Bingollu's counsel as counsel for the Class;

c) issuing proper notice to the Class at Defendants' expense;

d) declaring that Defendant committed multiple, separate violations of the FCRA;

e) declaring that Defendant acted willfully, in deliberate or reckless disregard of Plaintiff Bingollu's rights and Defendant's obligations under the FCRA;

f) awarding statutory and punitive damages as provided by the FCRA;

g) awarding reasonable attorneys' fees and costs as provided by the FCRA; and

h) granting further relief, in law or equity, as this Court may deem appropriate and just as provided by the FCRA.

139.    WHEREFORE, Plaintiff Wright, on behalf of herself individually, prays for relief as follows:

a) declaring that Defendant committed multiple, separate violations of the FCRA;

b) declaring that Defendant acted willfully, in deliberate or reckless disregard of Plaintiff Wright's rights and Defendant's obligations under the FCRA;

c) awarding statutory and punitive damages as provided by the FCRA;

d) awarding reasonable attorneys' fees and costs as provided by the FCRA; and

e) granting further relief, in law or equity, as this Court may deem appropriate and just as provided by the FCRA.

## <u>JURY DEMAND</u>

Plaintiffs are entitled to and hereby request a trial by jury.

Dated: September 6, 2023

Respectfully submitted,

/s/John G. Albanese
BERGER MONTAGUE PC
E. Michelle Drake, Bar No. 0387366
John G. Albanese, Bar No. 0395882
Ariana B. Kiener, Bar No. 0402365
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bm.net

jalbanese@bm.net
akiener@bm.net

*Attorneys for Plaintiffs*